# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DIANE GAUDREAULT, Individually,
THEODORE GAUDREAULT, Individually,
LINDSEY THOMAS, Individually,
and as Parent and Next Friend of and
on behalf of JAIDEN THOMAS,
BREEANNA THOMAS, minors, and as
Personal Representative for the ESTATE
OF ALEXIS THOMAS, deceased,

02 NOV 12 PM 1: 13

      **Plaintiffs,**

v.

      **No. CIV 01 1431 CLH/WWD**

WAYLON RADOSEVICH, WAYNE RADOSEVICH,
and PROGRESSIVE INSURANCE COMPANY,
a foreign corporation,

      **Defendants.**

## MEMORANDUM IN SUPPORT OF DEFENDANT WAYLON RADOSEVICH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PUNITIVE DAMAGES

COMES NOW, Defendant Waylon Radosevich, by and through counsel of record,

O'BRIEN & HOULISTON, P.C., by Daniel J. O'Brien and Steven E. Thompson, and hereby

submits this Memorandum in Support of Defendant Waylon Radosevich's Motion for Partial

Summary Judgment as to Punitive Damages. In support of his Motion, this Defendant states the

following:

### INTRODUCTION

This matter arises out of a single vehicle automobile accident that occurred on December

23, 1998 near Gallup, New Mexico. The Plaintiffs allege that Waylon Radosevich illegally

moved from the right to the left lane as the Gaudreault vehicle was passing, causing the

Gaudreault vehicle to go out of control and wreck off of the roadway. The Plaintiffs pled in their

Complaint to Recover Damages for Personal Injury (hereinafter "Complaint") a prayer for



punitive damages from all of the Defendants.  See Complaint, prayer ¶ B.  As for their

allegations to support their punitive damages claim, the Plaintiffs assert that the Defendant

Waylon Radosevich "operated the vehicle in a negligent, grossly negligent, careless and/or

reckless manner."  The undisputed facts make clear that, as a matter of law, Defendant Waylon

Radosevich is entitled to partial summary judgment as to all claims for punitive damages.

## UNDISPUTED MATERIAL FACTS

1.      The accident at issue happened on December 23, 1998 near Gallup, New Mexico.

Complaint ¶ 11.

2.      Plaintiffs complain that the Gaudreault vehicle was forced off of the road by

Waylon Radosevich pulling into their lane of traffic.  Complaint ¶ 11.

3.      Waylon Radosevich was driving a vehicle west on Interstate 40.  Complaint ¶ 11.

4.      Theodore Gaudreault was driving a vehicle west on Interstate 40.  Complaint ¶

11.

5.      Diane Gaudreault, Lindsey Thomas and Marlene DeCamp, among others, were

passengers in Mr. Gaudreault's vehicle, and all were witnesses to the accident.

6.      Waylon Radosevich was not cited for any offense relating to any type of

intoxication.  See State Police Report, attached hereto as Exhibit A.

7.      Waylon Radosevich had not consumed any alcohol or drugs of any type at any

time near the time of the accident, including the day of the accident and the day before the

accident.  Deposition of Waylon Radosevich, p. 25, 29, 106, attached hereto as Exhibit  B.

8.      Waylon Radosevich was traveling at about 70 to 75 mph at the time of the

accident.  Deposition of Waylon Radosevich, p. 49, attached hereto as Exhibit B; Deposition of

Theodore Gaudreault, p. 8-9, attached hereto as Exhibit C.

2

9.    Theodore Gaudreault was driving his vehicle faster than that of Mr. Radosevich at the time of the accident. Deposition of Theodore Gaudreault, p. 8-9, attached hereto as Exhibit C.

10.    Theodore Gaudreault did not recall seeing Waylon Radosevich's vehicle weaving at all prior to the accident. Deposition of Theodore Gaudreault, p. 11, attached hereto as Exhibit C.

11.    Waylon Radosevich looked into his rearview mirror and attempted to change lanes just prior to the accident. Deposition of Waylon Radosevich, p. 60, attached hereto as Exhibit B.

12.    Waylon Radosevich used his turning signal prior to attempting to change lanes. Deposition of Waylon Radosevich, p. 60, attached hereto as Exhibit B.

13.    Waylon Radosevich saw the Gaudreault vehicle some distance behind his vehicle in the rearview mirror prior to attempting to change lanes. Deposition of Waylon Radosevich p. 30, 53, attached hereto as Exhibit B.

14. Waylon Radosevich did not know that the Gaudreault vehicle had pulled to his vehicle's side prior to attempting to move into the left lane. Deposition of Waylon Radosevich p. 53, attached hereto as Exhibit B.

15.    As Waylon Radosevich's vehicle became flush with the center stripe, he noticed the Gaudreault vehicle go off of the road onto the right shoulder. Deposition of Waylon Radosevich p. 29, attached hereto as Exhibit B.

16.    Waylon Radosevich saw the Gaudreault vehicle go out of control and wreck. Deposition of Waylon Radosevich p. 30-32, 53-54, attached hereto as Exhibit B.

17.    Waylon Radosevich felt forced at the instance of seeing the accident to make the
NMSP aware in person of the accident because of the following: he was aware that a NMSP
station lay just a few miles in the same direction he was traveling, he had not been trained to
administer any type of first aid, and he did not have a cellular telephone with which to reach the
NMSP. Deposition of Waylon Radosevich, p. 32, 98-101, 105, attached hereto as Exhibit B.

18.    Waylon Radosevich sped directly to the nearest NMSP station, located just east of
Gallup, New Mexico.  p. 61, 65

19.    Waylon Radosevich did make contact with personnel at the NMSP station.
Deposition of Waylon Radosevich, p. 32-33, attached hereto as Exhibit B.

20.    Subsequent to making contact with personnel at the NMSP station, Waylon
Radosevich went directly back to the accident scene to render help.  Deposition of Waylon
Radosevich, p. 33, 67, attached hereto as Exhibit B.

21.    Assuming for purposes of this Motion only that Waylon Radosevich caused the
accident, Theodore Gaudreault has no evidence that Waylon Radosevich acted intentionally to
cause the accident.  Deposition of Theodore Gaudreault, p. 44-45, attached hereto as Exhibit C.

## ARGUMENT

I.    Partial summary judgment is proper in this case because there exist no genuine issues of
material fact.

"Summary judgment is appropriate if 'there is no genuine issue as to any material fact and .
. . the moving party is entitled to a judgment as a matter of law.'" Siemon v. AT&T Corp., 117 F.3d
1173, 1175 (10th Cir. 1997). (quoting Fed. R. Civ. P. 56(c)). The moving party bears the initial
burden of showing an absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S.
317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.
1996). Once the moving party meets this burden, the non-movant may not rest upon his pleadings,

4

but must set forth specific facts, supported by admissible evidence, showing a genuine issue for trial as to those matters for which he carries the burden of proof. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Kaul, 83 F.3d at 1212. Mere conclusory statements are inadequate to defeat a summary judgment motion. See Nichols v. Hurley, 921 F.2d 1101, 1113 (10th Cir. 1990).

There is no genuine issue of material fact with regard to the issue of evidence sufficient to establish the foundation for a punitive damages claim. The Defendants are therefore entitled to judgment as a matter of law.

## II.   Punitive damages can, only be granted when there is evidence of a culpable mental state.

Under New Mexico law, punitive damages can only be awarded when there is some evidence that the wrongdoer had a culpable mental state. Clay v. Ferrellgas, Inc., 118 N.M. 266, 269, 881 P.2d 11 (1994). The wrongdoer's conduct must rise to the level of willful, wanton, malicious or reckless conduct; evidence of gross negligence is not sufficient to support an award of punitive damages. Hinger v. Parker & Parsley Petroleum Co., 120 N.M. 430, 446-47, 902 P.2d 1033, 1049-1050 (Ct. App. 1995); see also Paiz v. State Farm Fire & Cas. Co., 118 N.M. 203, 211-13, 880 P.2d 300, 308-311 (1994) (abolishing gross negligence standard for punitive damages in a breach of contract case). Punitive damages require "' a positive element of conscious wrongdoing.'" Paiz, 118 N.M. at 211, 880 P.2d at 308 (quoting Charles T. McCormick, Handbook on the Law of Damages § 79, at 280 (1935)). "There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton." W.

Page Keeton et al., Prosser & Keeton on the Law of Torts § 2, at 9-10 (5th ed. 1984) (footnotes omitted).

Plaintiffs cannot show any culpable mental state on the part of Waylon Radosevich. Even assuming for purposes of this Motion only that Waylon Radosevich's actions caused the Plaintiffs' damages, this Defendant's conduct does not rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level. These are the only mental states that will support an award of punitive damages. Clay, 118 N.M. at 269; see also Sunwest Bank of Albuquerque v. Daskalos, 120 N.M. 637, 639, 904 P.2d 1062, 1064 (Ct. App. 1995). Malicious conduct is the intentional doing of a wrongful act with knowledge that the act is wrongful. Willful conduct is the intentional doing of an act with knowledge that harm may result. Reckless conduct is the intentional doing of an act with utter indifference to the consequences. Wanton conduct is the doing of an act with utter indifference or conscious disregard to a person's rights or safety. Rule 13-1827 NMRA 2002 (Punitive Damages Instruction). The New Mexico jury instruction currently in effect does not allow for the imposition of punitive damages even upon a showing of gross negligence. Rule 13-1827 NMRA 2002.

Waylon Radosevich was not speeding (Undisputed Material Fact No.8), was not driving under the influence of any legal or illegal substances (Undisputed Material Fact Nos.6, 7), checked his rearview mirror before attempting to change lanes (Undiputed Material Facts Nos. 11, 13), and did not do anything to make Mr. Gaudreault believe that the accident was the result of any intentional act (Undisputed Material Fact No.21). Assuming for purposes of this Motion only, that Waylon Radosevich did cause the accident, he is guilty only of moving toward or into the left lane of traffic without making a better effort to determine the position of the Gaudreault vehicle. There is no evidence that Waylon Radosevich, whether guilty of causing the accident or

not, ever acted willfully, wantonly, maliciously or recklessly, as those terms are defined by New Mexico law. Simply put, the Plaintiffs have not and cannot show that Waylon Radosevich, under any theory of recovery, acted with any culpable mental state.

WHEREFORE, this Defendant respectfully requests this Court to issue an Order granting him a partial summary judgment as to punitive damages, for the costs of bringing this Motion, and for such other and further relief as the Court deems just.

Respectfully Submitted,

O'BRIEN & HOULISTON, P.C.

Daniel J. O'Brien
Steven E. Thompson
Attorneys for Defendants
6301 Indian School Rd. NE, Suite 800
Albuquerque, NM 87110
(505) 883-8181

I hereby certify that a true and correct copy of the foregoing was mailed to all counsel of record this ___ day of November, 2002.

Steven E. Thompson

EXHIBIT A

U 6 1 1 2 1 5

N. MEXICO STATE POLICE

STATE OF NEW MEXICO
UNIFORM ACCIDENT REPORT

| ☐ ON PRIVATE PROPERTY | ☐ FATAL | ☒ INJURY | PROPERTY DAMAGE ONLY | ☐ UNDER $350 | ☐ $500 OR MORE | ☐ HIT AND RUN |
|---|---|---|---|---|---|---|

| DATE OF ACCIDENT MO. 2 DAY 23 YR. 98 | Military Time 12:00 | CITY OCCURRED IN NONE | COUNTY MCKINLEY | SHEET 1 OF 2 SHEETS |
|---|---|---|---|---|

| SUN | M | T | W ☒ | T | F | SAT | ACCIDENT OCCURRED ON: I-40 | AT INTERSECTION WITH: NONE |
|---|---|---|---|---|---|---|---|---|

OTHER LOCATION .02 ☒ MILES ☐ FEET  N S ☒ W ☐ OF OVERPASS 6367  (PERMANENT LANDMARK—COUNTY LINE—INTERSECTION)  FOR USE BY ORIGINATOR

MILEPOST LOCATION 0.1 ☒ MILES ☐ FEET  N S E ☒ OF MILEPOST NO. 34

| ACCIDENT OCCURRED | ☐ On Roadway  ☒ Off Roadway | ACCIDENT CLASSIFICATION | ☒ Overturned  ☐ Parked Veh | ☐ Other N-Col  ☐ R.R. Train | ☐ Pedestrian  ☐ Pedalcyclist | ☐ Other Vehicle  ☐ Animal | ☐ Vehicle On Other Rdwy  ☐ Fixed Object | ☐ Other Object |
|---|---|---|---|---|---|---|---|---|

**VEHICLE NO. 1**

HEADED  N S E ☒ ON: I-40   Posted Speed 75   Safe Speed 75

| Driver's Full Name WAYLON R RADOSEVICH | Address 629 MCKEE DR. GALLUP NM 87301 | Zip Code 87301 | Phone 505 863 3601 |
|---|---|---|---|

| Driver License Number 121970104 | State NM | Type D | Restrictions NONE | Expires 020802 | Date of Birth MO 01 DAY 08 YR 72 |
|---|---|---|---|---|---|

| Seat Position Code | LR CR ☒ AA OTHER | Social Security Num. 525456153 | Occupation BIGO TIRES MECH | Seat Belt 6 | Helmet Yes No N/A | Age 16 | Sex M | Injury 0 |
|---|---|---|---|---|---|---|---|---|

| Seat Pos. | Occupant's Name | Occupant's Address/Zip Code | | | | | |
|---|---|---|---|---|---|---|---|
| | NONE | | | | | | |

| Vehicle Yr. 78 | Vehicle Make PONT | Color SILVER | Body Style 2 DOOR | Removed To: DISTINATION | Removed By: DRIVER |
|---|---|---|---|---|---|

| License Yr. 6/99 | State N/M | License Number 693 LBR | US DOT/ICC/SCC Numbers N/A | VIN 2G2F522KAW222186 | Owner's Telephone (505) 863 3601 |
|---|---|---|---|---|---|

| Owner's Name RADOSEVICH WAYNE | Owner's Address 711 EAST 66 GALLUP | Zip Code 87301 |
|---|---|---|

| Insured By (Name of Company) PROGRESSIVE CASUALTY | Policy Number AA104127070 | Liability Insurance ☒ Yes ☐ No | VEHICLE DAMAGE ☒ HEAVY ☐ MODERATE ☐ SLIGHT |
|---|---|---|---|

**VEHICLE NO. 2—PEDESTRIAN**

HEADED  N S E ☒ ON: I-40   Posted Speed 75   Safe Speed 75

| Driver's or Pedestrian's Full Name THEODORE L. GAUDREAULT | Address 2636 N 56TH ST LINCOLN NB | Zip Code 63504 | Phone (402) 466-0151 |
|---|---|---|---|

| Driver License Number G021532 95 | State NB. | Type O | Restrictions NONE | Expires 10-18-00 | Date of Birth MO 0 DAY 19 YR 44 |
|---|---|---|---|---|---|

| Seat Position Code | LR CR AA OTHER | Social Security Num. 506 466010 | Occupation FLOOR CO. | Seat Belt 6 | Helmet Yes No N/A | Age 54 | Sex M | Injury 0 |
|---|---|---|---|---|---|---|---|---|

| Seat Pos. | Occupant's Name | Occupant's Address/Zip Code | | | | | |
|---|---|---|---|---|---|---|---|
| CR | LINDSY THOMAS | 2636 N 56 TH ST LINCOLN NB. | 6 | N/A | UK | F | B1 |
| RF | MARLENE L. DITAMP | 2406 AVE GOTHIC NSBG NB | 6 | N/A | 64 | F | C |
| OT | DIANE D GUDREAILT | 2636 N 8TH LINCOLN NB. | 6 | N/A | 52 | F | C |
| OT | ALEXIA THOMAS | 2636 N 56TH LINCOLN NB | 8 | N/A | 3 M | F | 0 |
| OT | BREANA THOMAS | 2636 N 56TH ST. LINCOLN NB | 8 | N/A | 3 M | F | 0 |

| Vehicle Yr. 95 | Vehicle Make DODGE | Color GREEN | Body Style VAN | Removed To: GALLUP | Removed By: TED'S |
|---|---|---|---|---|---|

| License Yr. 1/99 | State NB | License Number 026 370 | US DOT/ICC/SCC Numbers N/A | VIN 2B5WB35255K535851 | Owner's Telephone (402) 966-0151 |
|---|---|---|---|---|---|

| Owner's Name THEODORE L GAUDREAULT | Owner's Address 2636 N. 56 TH ST LINCOLN NB. | Zip Code 86504 |
|---|---|---|

| Insured By (Name of Company) MID ALLIANCE INSURANCE | Policy Number UNKNOWN | Liability Insurance ☒ Yes ☐ No | VEHICLE DAMAGE ☒ HEAVY ☐ MODERATE ☐ SLIGHT |
|---|---|---|---|

| INJURED First Aid Render By MED STAR | Injured Taken To: RMCH | By: MED STAR |
|---|---|---|

OTHER PROPERTY INVOLVED: DESCRIPTION OF PROPERTY AND DAMAGE 30 FT. R/GHT OF WAY FENCE

Owner's Name HWY DEPARTMENT  Owner's Address/Zip Code PO BOX 2800 87301

WITNESS  Name NONE KNOWN   Age   Address   Telephone

**INJURY CODES**
K- Killed
K1 Head   K3 Neck
K2 Chest   K4 Other
A- Incapacitated
Carried/From Scene
A1 Head   A4 Hand
A2 Chest   A5 Arm/Legs
A3 Back
B- Visible Injury
B1 Head   B4 Hand
B2 Chest   B5 Arm/Legs
B3 Back
C- Complaint
C1 Head
No Visible Injury
O- No Apparent Injury

**SEAT BELT CODES**
1. Belt Not Installed
2. Belts Installed and Not Used
3. Belts Installed And Used
4. Shoulder Harness Installed And Not Used
5. Shoulder Harness Installed And Used
6. Combination Belts And Harness Used
7. Ejected From Vehicle
8. CHILD RESTRAINT
8A. Used
8B. Not Used

ISSUING AGENCY COPY

1. COMPLETE FRONT OF FORM.  2. REMOVE CARBON AND TISSUE PAPER.  3. TURN OVER AND COMPLETE REVERSE SIDE.

| | WEATHER | ROAD SURFACE | ROAD SURFACE | TRAFFIC CONTROL | ROAD CHARACTER | ROAD DESIGN |
|---|---|---|---|---|---|---|

**APPARENT CONTRIBUTING FACTORS**

**WHAT DRIVERS WERE DOING**

**DRIVER OR PEDESTRIAN SOBRIETY**

**DRIVER OR PEDESTRIAN PHYSICAL CONDITION**

**PEDESTRIAN ACTION**

| Diagram Drawn By | Measurements By | Leave Blank |
|---|---|---|
| OFFICER ALANIS | OFFICER ALANIS | |

**DIAGRAM**

VEHICLE #1 AND VEHICLE #2 WERE WEST BOUND. VEHICLE #2 WAS IN THE LEFT LANE ATTEMPTING TO PASS VEHICLE #1. VEHICLE #1 BEGAN TO PASS A VEHICLE IN FRONT OF HIM. DRIVER OF VEHICLE #1 STATED THAT VEHICLE #2 WAS IN HIS BLIND SPOT AND DID NOT SEE IT UNTIL HE BEGAN TO MOVE INTO THE LEFT LANE. VEHICLE #1 QUICKLY RETURNED TO THE RIGHT LANE AVOIDING CONTACT WITH VEHICLE #2. DRIVER OF VEHICLE #2 STATED HE SAW VEHICLE #1 BEGAN TO MOVE INTO HIS LANE HE QUICKLY SWERVED TO THE LEFT TO AVOID HITTING VEHICLE #1. VEHICLE #2 BEGAN TO SLIDE IN THE MEDIAN AND DRIVER OF VEHICLE #2 THEN SWERVED BACK RIGHT AND SKID ACROSS THE HIGHWAY ONTO

**NARRATIVE** (Describe how accident occurred)

ROAD WHERE VEHICLE #2 ROLLED 1 TIME BREAKING THROUGH THE RIGHT OF WAY FENCE. VEHICLE #1 WAS UNDAMAGED AND DRIVER WAS UNINJURED. VEHICLE #2 WAS TOTALY DAMAGED AND ALL 3 ADULT PASSENGERS COMPLAINED OF INJURIES AND WERE TRANSPORTED TO RMCH BY MED/STAR AMBULANCE. 3 PASSENGERS WERE CHILDREN AND WERE ALSO TRANSPORTED. DRIVER OF VEHICLE #2 ADVISED HE WAS FINE AND REFUSED MEDICAL ATTENTION.

| TRAILER OR TOWED VEHICLES | TOWED BY VEH. #1 | Year | Make | Lic. Yr - State - Number | T,OR |
|---|---|---|---|---|---|
| | TOWED BY VEH. #2 | Year | Make | Lic. Yr - State - Number | T,OR |

**ENFORCEMENT ACTION**

| VEH. NO. | Name | Violation | W | A | B | C | Citation No |
|---|---|---|---|---|---|---|---|
| 1 | WAYLON R. RADOSEVICH | INPROPOR PASSING | | | | | 30.37001 |
| | | | | | | | |
| | | | | | | | |

| Time Notified | Time Arrived | Notified By | | ID No | District | Date |
|---|---|---|---|---|---|---|
| 1216 | 1221 | GALLUP DISPATCH | OTTMAN | 337 | 06 | 12-23-98 |

Officer's Signature  ADOLFO ALANIS

THIS REPORT MAY CONTAIN



STATE OF NEW MEXICO UNIFORM ACCIDENT REPORT

SUPPLEMENTAL DIAGRAM/NARRATIVE

63058

S.470-1007S
REV 5/92

VEHICLE #2 ADDITIONAL PASSENGER

| | | SEAT BELT | AGE | SEX | INJURY |
|---|---|---|---|---|---|
| OTT JADEN THOMAS 2636 N. 56TH ST LINCOLN NB | | 8A | 2 | M | O |

POINT "0" EDGELINE ITEM

| | POINT "0" | EDGELINE | ITEM |
|---|---|---|---|
| A | 212⁴ | 7⁸ | START SKID LEFT |
| B | 279⁶ | 5⁰ | START SKID RIGHT |
| C | 328¹ | O | RIGHT SKID CROSS EDGE L. |
| D | 358ˣ | O | LEFT SKID CROSS EDGE L. |
| E | 383⁵ | 12⁵ | RIGHT SKID CROSS CENTER L |
| F | 439⁸ | 12⁵ | LEFT SKID CROSS CENTER LI |
| G | 415⁴ | 24⁶ | RIGHT SKID CROSS WHITE LIN |
| H | 440⁴ | 24⁶ | LEFT SKID CROSS WHITE LIN |
| I | 586² | 119⁹ | LEFT FRONT TIRE |
| J | 590¹ | 129¹⁶ | LEFT REAR TIRE |

DIAGRAM NOT TO SCALE
DRAWN BY: OFFICER ADOLFO ALANIS
12/23/98

EXHIBIT B

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 22

```
 1   Q  Okay.
 2   A  I'm not sure the day they --
 3   Q  Well --
 4   A  -- bought it, to be honest.
 5   Q  All right.  I -- I don't need the date exactly,
 6  but approximately.  Was it the summer?  Was it the spring?
 7   A  It was maybe the summer.
 8   Q  Okay.
 9   A  I think they might've got it during the summer.
10   Q  Okay.  Was it brand-new?
11   A  Yes, it was.
12   Q  And was it mainly your car to use?
13   A  Yeah.  It was mainly mine.
14   Q  Okay.
15   A  But they drove it when they needed it.
16   Q  All right.
17   A  My mother, she drove it, too.
18   Q  So your dad bought it for you to use?
19   A  Yeah.
20   Q  Okay.  And did you drive it to school?
21   A  Sometimes, yeah.  If I didn't go with my other
22  buddy, I'd take my car to school, yeah.
23   Q  How often did you drive it to school?
24   A  Depends.  More than half the time.
25   Q  Okay.  And who did you normally ride with when
```

Page 23

```
 1  you weren't driving?
 2   A  A lot of people.  Ernie, my buddy Ernie, Mark.
 3  A lot of people.  Just whoever wanted me to pick me up.
 4  Depending what we were going to do that day.  Depending if
 5  we were playing sports.  It depended on what I was going
 6  to do in school, who I went with, you know.
 7   Q  Okay.  So you'd take turns, then?
 8   A  It just depended, yeah.  It was just whenever,
 9  whoever, whatever.
10   Q  Would you pick up other guys, too?
11   A  Yeah, of course.
12   Q  Okay.  So do you remember what you did the night
13  before?  Were you -- Did you go out?  You mentioned you'd
14  just go out cruising sometimes.
15   A  Yeah, we just -- I didn't do too much that
16  night.
17   Q  Okay.
18   A  I was at home most of the night with my mom.  I
19  remember we ate.  She cooked.  I know I ate.
20   Q  Did you go out cruising with your friends?
21   A  No.  Early in the day -- That day, I was home
22  pretty early that night.  That's why I got up so early --
23   Q  Okay.
24   A  -- because I think I was tired.  Because I
25  wouldn't have got up so early if I'da stayed out all
```

Page 24

```
 1  night.
 2   Q  Okay.
 3   A  So I -- I think I was pretty much home.
 4  Probably -- I think we did play basketball, because I had
 5  my shorts on.  Yeah.
 6   Q  The day before?
 7   A  Yeah.  No, not the day before.  The same.  I
 8  think we played a game of basketball again that night.
 9      Yeah, the day before the accident, you're
10  saying?
11   A  Right.
12   Q  Yeah.  Yeah.
13   A  Okay.  So that's Tuesday, the day before.
14  You --
15   A  I know I was home most of the day at night, the
16  nighttime.
17   Q  Okay.  Do you remember what --
18   A  Probably about -- after 6:00, I was probably
19  home, because I know she cooked dinner.
20   Q  Okay.
21      (Discussion off the record.)
22   Q  So you were saying you got up on Wednesday
23  morning around 8:00 or 9:00.
24   A  8:00 or 9:00, sometime in that.
25   Q  And then you got a call from Nick?
```

Page 25

```
 1   A  Mr. Nick Tamado.
 2   Q  About what time?
 3   A  I'm not sure.  It has to be anywhere from
 4  9:30 to 10:30.
 5   Q  Okay.
 6   A  It has to be.
 7   Q  And what did he ask you?
 8   A  If I could give him a ride out to -- out to the
 9  Giant Refinery.
10   Q  Okay.  The -- the day before, the night before,
11  had you had anything to drink with your friends?
12   A  No, hmm-um.
13   Q  Beer or wine?
14   A  No beer, no -- no nothing.  No intoxicants, no
15  drugs, no nothing.
16   Q  And did Nick ask you to do anything else other
17  than give him a ride?
18   A  Hmm-um.  Just go out there.  That's what we
19  usually did.  We usually went out there a lot.
20   Q  To do what?
21   A  To play video games.
22   Q  Okay.  Would you play games --
23   A  My other buddy worked out there, too, as well,
24  James Horrocks.
25   Q  How do spell his last name?
```

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM  87110

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 26

1    A   H-O-R-R-O-C-K-S.
2    Q   Okay.
3    A   Horrocks.
4    Q   What did he do out there?
5    A   He was on the diesel side, I think.  A field guy
6    for the diesel side.
7    Q   Okay.
8    A   A register -- I don't know what -- he worked on
9    the diesel side.  That's all I know.  Nick Tamado was a
10   security guard.
11   Q   Would Nick play games with you after he clocked
12   in as well?
13   A   No.  He was a security guard.  He'd go to work.
14   I'd just do my own.  Usually James would be off -- or
15   James would, because he wasn't a security guard.  He
16   didn't -- you know, he was my age.  Nick's a little older
17   than us.
18   Q   How old is Nick?
19   A   Twenty-something, 28, 25.  I believe he's a
20   couple years older than us.  He's not quite in our age
21   group.
22   Q   How -- where did you meet him?
23   A   I met him a long time ago when I was about 14.
24   I met him through the mother of my child, Linda Santiago.
25   She knew him through her brothers and so on, and I just

Page 27

1    met him.  He -- through our neighborhood, he -- his -- a
2    lot of his friends lived in my neighborhood.
3    Q   Okay.  So you --
4    A   I just met him just out of -- you just meeting
5    people.
6    Q   Okay.
7    A   I've just -- knowing him.  I've seen him around,
8    and we got to know each other, and we became friends.
9    Q   Okay.  So what time did you pick up Nick to take
10   him out to the Giant Refinery?
11   A   It had to be after 10:30 if I was coming back
12   around 12:00.  We were there for at least an hour, you
13   know.  So 10:30, 11:00.  It takes about 15 minutes to get
14   out there, and we were out there for about 30 minutes.
15       And you say the wreck was around noon, on the
16   way in or so?
17   Q   The police report indicates 12:00 noon.
18   A   So on the way -- probably about 11:00, maybe
19   10:45, because I must have left -- he lives right up the
20   street.  He lives up on "Snob Hill," they call it, or --
21   He lives up on the hill from my neighborhood.
22   Q   Okay.
23   A   So I picked him up, we hit the freeway, we went
24   out there around then.  It would have to be 10:45 to 11:00
25   I picked him up --

Page 28

1    Q   All right.
2    A   -- 'cause I -- for us to get back by noon.
3    Yeah.
4    Q   Did you stop anywhere after you picked him up?
5    A   No, we went straight out there.  That --
6    Q   And --
7    A   -- was it.
8    Q   And so --
9    A   Excuse me.
10   Q   -- you got out there about what time?
11   A   Maybe 12:00 - no, 11:00.  Probably 11:00 if it
12   happened at 12:00.  We were there probably about an hour
13   before the wreck happened, because we weren't there very
14   long either.
15   Q   Okay.  And what did you do while you were out
16   there?
17   A   Just played games.  And he said, "I got to go
18   talk to my boss," or something.
19       I said, "All right."  I played for a while, out
20   to my car, and I took off.
21   Q   Okay.
22   A   And there's not too much to do out there, but,
23   you know --
24   Q   Okay.
25   A   Pretty much it.

Page 29

1    Q   Did you have anything to drink while you were
2    out there?
3    A   No.  You can't drink out there.  There's no
4    liquor out there.
5    Q   I mean, did you have any liquor with you in the
6    car?
7    A   No.  No liquor, no drugs, no --
8    Q   Then you -- What did you do after you left
9    there?
10   A   Drove home.
11   Q   Okay.  Tell me what happened on the way home.
12   A   I was driving home, and probably about three or
13   four miles out of Gallup, I'm driving, I go to pass this
14   vehicle, I look in my rearview mirror, I see the van, and
15   as I'm going, I shift over about flush, I'd say flush with
16   the yellow line.  I'm going, and I see him, and I look.  I
17   could see him in my blind spot, because, you know, there's
18   a blind spot in this little car.
19       So I look, and I can see him way back there, and
20   I can see in my rearview mirror.  And I put my blinker on.
21   There's a car in front of me.  We were going 75 miles an
22   hour.  And I go to pull, and right when I get flush with
23   the -- the -- you know, the line, the middle line of the
24   highway, I see like the corner of a van light in my
25   rearview mirror, just -- I mean, coming.  I just seen it

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM  87110

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 30

1   like (indicating sound), just fly up on me. And they were
2   pretty far behind me when I looked.
3      Q   How far behind you?
4      A   I'd say about a good 40 yards. They were far.
5   They were -- to turn my neck this way (indicating) and
6   look out my car, they were pretty -- I mean a nice
7   distance.
8      Q   Okay. What --
9      A   I mean --
10     Q   -- do you mean by flush against the yellow line?
11     A   Like right with it. I was driving in the
12   middle, and as I was turning, I didn't even cross over.
13   I -- 'cause I remember the front of the other car. My
14   headlight was like -- here's (indicating) their -- their
15   taillight, you know, and the other car was right here
16   (indicating), and I -- I barely even went like that
17   (indicating). I seen them, and all of a sudden this van
18   comes up next to me. They flew up next to me except they
19   were off the road.
20         I was going, I seen them, I -- I started pulling
21   back in my lane because I seen him come so fast. You know
22   what I mean? I was straight, look -- all right. Here's
23   (indicating) your highway flush, flush with the
24   centerline. When you drive in between the two lines, you
25   drive in between them, right? Here's (indicating) the

Page 31

1   line you can't go over, right, and here's the -- the
2   middle, the checkered lines, the -- and I was in the
3   middle.
4         I came flush with those, then I pulled back over
5   out of it because I seen him coming so fast in my mirror.
6   They came up right next to me except they were off the
7   shoulder. They were in the median. Their left tires were
8   in the median, and they were riding, and they were right
9   there. I could see the driver's face.
10        And we were going straight like this
11   (indicating) with each other, and then he turned his
12   wheels, and I seen his wheels turn like this (indicating),
13   like to get back on the road, but instead they were
14   getting pushed. You know what I'm saying? The -- the
15   tires were getting pushed. And then all of the sudden,
16   his front end just popped up. It just like (indicating
17   sound). It just popped up at me, and I could see the
18   grille of the van coming directly -- directly, directly at
19   my window.
20        They were like this (indicating) now. Now we're
21   like this (indicating), and they were coming at me to hit
22   me, so I punched it. I -- I hit the gas, and I went this
23   way (indicating) off, and I went maybe a couple feet off.
24   I maybe centerlined, you know, the -- off the -- I was off
25   the -- to the right shoulder now.

Page 32

1         They were coming this way, and I punched it.
2   They go like this (indicating). I see -- I see a
3   guardrail right here (indicating) in front of me, so I'm
4   going directly at the guardrail; they're coming this way
5   (indicating). I move back into the lane. Now they're
6   directly behind me, and they're skidding and whatever.
7   And I seen them in my mirror, and then I seen them go off,
8   then I see them go off the thing. And that was pretty
9   much it.
10     Q   What happened next?
11     A   I punched it. The -- I seen -- I knew the State
12   Police Office were there. I looked, I knew I could
13   turned around and just -- and when I seen them go off,
14   I -- I seen the van go off, and I looked, and I -- and I
15   could see them in the distance, so I just punched it.
16   I -- I started freaking out, like, Oh, my God. I just
17   seen someone wreck. I just seen 'em wipe out hard, you
18   know. I just -- I just freaked out, and I just went as
19   fast as I good to the State Police.
20        I ran in, I said, "I've seen a wreck,"
21   blah-blah-blah, gave them a description of the van,
22   description of me, gave them my name, I told her.
23        She said, "All right. Calm down. Calm down. A
24   trucker already called it in," she told me, or "someone
25   called it in, you're fine."

Page 33

1         And I explained to her, "Well, I'm going back."
2   So I came in on I-40, I came around, I got on 66, I hauled
3   to the police station, and then I stayed on 66 and went
4   back out to the wreck. Then I went back out there to see,
5   you know, what I seen, if everyone was all right, what was
6   just -- pretty much just freaked me out, so I wanted to go
7   back and see what was going on.
8         I went back, I seen an officer, I got there,
9   started telling him what happened. I told him that I seen
10   the wreck. Then I -- I looked around, I seen presents, I
11   seen stuff all over. I seen a baby pacifier. I had
12   barely had my child. She was maybe four or five months as
13   well. I started -- You know, I just tripped out, because
14   I -- because I -- "Is the kids okay?" That's the main
15   thing I started asking, "Is kids okay? Is everyone okay?"
16        The officer said, "Yes. There's three babies.
17   They're -- they're in the paramedics."
18        I said, "Okay." I went, I looked at them. I
19   went just -- just to check them out, you know. I mean, I
20   was freaked out. There's stuff all over. The van was
21   twisted metal. I was just glad I wasn't a part of it, you
22   know. I just -- I just didn't want to be. I was just --
23   I was tripping out. I -- you know, what else are you
24   supposed to do? You're 16 years old, and you -- and you
25   see people fly off the road, then you come back, and it's

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM 87110

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 50

1   what I mean?  That car drove real smooth.  It was just
2   like (indicating sound).  It was —
3       Q   Did you — How do you know you were going 75?
4       A   Because I looked at the speedometer before I
5   started to pass.
6       Q   Okay.  Did you have your foot on the accelerator
7   or did you have it on cruise control?
8       A   I had it on the — I was driving.  I was
9   manually driving.  I didn't have it on cruise.
10      Q   Okay.  And the car that you were coming up on —
11      A   I was already on them.  I had been behind them
12  for a little bit, and — you know what I mean?
13      Q   What's "a little bit"?
14      A   Maybe about 10, 15 seconds, probably about 30
15  seconds.  I'd been behind them for maybe a minute or two,
16  but when I started getting closer, as — you know when
17  you're driving the speed limit and you just — you just
18  start coming up on people that may be going 65, 70, just
19  slowly varies.  The variation in between our — our speeds
20  were different.  And it just got too close, so I went to
21  pass.  And I looked in my mirror, and I seen them.
22      Q   You looked in wh- — which mirror?
23      A   My mirror, my rearview — or the —
24      Q   Your side mirror?
25      A   — my side view, my side rearview or whatever.

Page 51

1       Q   Your left —
2       A   Yeah.
3       Q   — side view?
4       A   And then I could — looked back, and I could see
5   them way back there, but when I — when I was passing
6   again, they weren't in there, so they had already came up
7   on my blind spot.  I seen them this way (indicating), I
8   seen them the first time, but when I was passing again, I
9   didn't seem them until I started turning, and then they
10  came, and I — I pulled back in, and they just (indicating
11  sound).  That's when they came right next to me.
12          And I didn't even get a chance to go in their
13  lane.  I was already in my lane when they were — they
14  were like half on the road, half off the road.  But they
15  just — they came up so fast, they just — I mean, quick.
16  It was like that.  It couldn't have been more than like a
17  couple seconds.  I turned my head, turned back, started
18  moving.  It was just all in one motion, you know.  You're
19  driving, and just here they came.
20      Q   The white car that you saw in front of you —
21      A   Yeah.
22      Q   — that was doing about 70 miles an hour, was it
23  getting ready to exit off I-40?
24      A   There was no exit, no.
25      Q   Okay.

Page 52

1       A   There was not even an exit from there until
2   Gallup, so there was no exit from the wreck all the way
3   until —
4       Q   Okay.
5       A   — until I got to the State Police.
6       Q   And — and no exit anywhere near where they were
7   getting off?
8       A   No.
9       Q   Well, I mean where — where the incident
10  happened or where you started to —
11      A   Not for —
12      Q   — change lanes?
13      A   — about three or four miles up, there was no
14  exit.
15      Q   Okay.
16      A   There's no way they were — they were just — it
17  was just straight road.
18      Q   Okay.
19      A   The only place to go was straight.
20      Q   So when you decided to make your lane change,
21  you thought there was no one in the lane next to you on
22  your left?
23      A   There was no one next to me —
24      Q   Okay.
25      A   — because I looked.  I looked in my rearview

Page 53

1   mirror, but I seen a van —
2       Q   Way —
3       A   — way back there.  I — when I could see it in
4   this (indicating), they're not in a blank spot, you know.
5   Like here's their car, and then the way those Firebirds
6   are made, it's — there's like a blind spot from here
7   (indicating).  Like here's (indicating) my car, and
8   there — you can't see at this angle.  You can see in your
9   rearview, you can see back, but if they come to a certain
10  angle, the only way to see is to turn your head back.  So
11  I always — I learned that.  Right when I got the car,
12  it's — you always have to turn in that car.
13      Q   Okay.
14      A   So what I did, was I turned my head back, I seen
15  the van after I had looked in the mirror first.  I looked,
16  and then I started passing.  There was no one.  And right
17  when I started shifting into that lane — that's what I
18  mean about flush, about — when I got flush, when my
19  mirror was on the other side of the line is when I seen
20  them, like the headlight, and I said, "Whoa."  And I
21  didn't even jerk.  I wasn't even like overcorrection.  It
22  was just like (indicating sound).  I mean that car was
23  just — it floats.  So I just (indicating), you know.  I
24  pulled right back over.
25          And all of a sudden it's just like (indicating

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM  87110

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 54

1  sound). I seen dust, that's what I seen first. It was
2  like (indicating sound) just right next to me, and -- I
3  mean, they were just going. And they almost passed me
4  until he turned his wheels. And when he turned his
5  wheels, they were still going the same speed as me. Those
6  wheels were just pushing, just (indicating sound), you
7  know. And he started to pass me even. And then like --
8  that's when it popped on. It popped -- they might have
9  popped on a little ahead of me, in fact, like (indicating
10 sound), like -- probably like that, and then they popped
11 on. And my car, you know, even them out. And they were
12 sliding on their side, because I remember that, too. And
13 they slid right behind me. I went like that (indicating),
14 got back on. All I seen was (indicating), you know, dust,
15 bushes.
16     Q   You said you saw the driver when you were moving
17 in -- over into that lane.
18     A   Yeah.
19     Q   Did you --
20     A   We --
21     Q   -- see who was driving?
22     A   I seen the man driving. I could see him. When
23 they came up on me and I turned my head, I could see both
24 of them, the passenger and the driver. And they -- and he
25 was like (indicating).

Page 55

1      Q   Do you remember what the passenger looked like?
2      A   Yeah. He was young -- he was an older man, like
3  kind of bald, maybe.
4      Q   The passenger?
5      A   No, the -- the passenger's a woman.
6      Q   Okay.
7      A   The man -- I know the driver. I know for -- the
8  driver. I talked to the driver.
9      Q   Okay. And the -- the -- the pers-- --
10     A   They can't -- I can't think of them that good.
11         Go ahead.
12     Q   The -- the passenger up front, what did she look
13 like?
14     A   I'm not too sure. I'm not.
15     Q   Young? Old?
16     A   Older. She wasn't that old.
17     Q   Blonde? Brunette?
18     A   I didn't get a good look at her, as good as look
19 as I got at the girl in the van, so . . . I didn't -- you
20 know? I seen the driver, I seen two people. I seen him
21 mainly, then all of a sudden I seen the girl in the van,
22 is what I mainly seen. I just seen the van, is what I
23 remember the most.
24     Q   What color was the van, that you recall?
25     A   I didn't think it -- you said it's like a aqua

Page 56

1  green or --
2      Q   Well --
3      A   -- a dark green. I thought it was a little --
4      Q   I've never seen the van, so I don't know.
5      A   The van, I thought it -- it was like a green,
6  but like a darker green, like a darker blue-green. Like a
7  real -- like a -- I don't know. It looked kind of like a
8  blackish green to me. Like darker than emerald, you know.
9      Q   Um-hmm.
10     A   That's what I thought it was. I didn't think it
11 was like a --
12     Q   A grey? You thought it was more black?
13     A   Like -- yeah. Like a blue and green mixed, you
14 know, so I don't know how you'd put that.
15     Q   Okay.
16     A   Not black, though. Not a black van.
17     Q   Did you --
18     A   I knew it wasn't black, but it was -- it's like
19 a mixture of two colors that makes a blue-green, but like
20 a green.
21     Q   Was it a two-tone or a single color?
22     A   Yeah, like you say, a two-tone. Like not --
23 like not one solid color.
24     Q   No, I -- I mean, was -- did it have --
25     A   No, it was just --

Page 57

1      Q   It was just --
2      A   -- one solid --
3      Q   -- one solid color?
4      A   Yeah, it was one solid van.
5      Q   Okay.
6      A   I know that much.
7      Q   You -- you said earlier you thought it was an
8  18-person van. What made you think that?
9      A   It was a long van. It was just -- it was real
10 long.
11     Q   Did you count out the seats or anything?
12     A   Yeah. I seen three seats in the back when I was
13 throwing their presents back in there. Because I was
14 picking up all their stuff, you know. I was helping them.
15 I was just --
16     Q   Okay.
17     A   I was there.
18     Q   Was anyone left in the van when you got there?
19     A   No. No one was left in the van. Everyone was
20 out either on a stretch board or paramedics or talking to
21 the police or --
22     Q   Um-hmm.
23     A   -- you know.
24     Q   Did you talk to anyone else while you were out
25 there besides the police and --

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM 87110

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 58

1    A  No, I talked to him and the police. I might
2  have said "Hello" or "Are you okay?" to a couple people,
3  but they wouldn't say too much. The driver is the only
4  one that really responded to me, talked back to me.
5    Q  Did you ever talk to any of them again after you
6  left the scene?
7    A  No, I — I couldn't. They were — I didn't know
8  who they were or where they were from or —
9    Q  Okay. Did you ever --
10    A  I think I called the hospital, I think. I —
11  I'm not sure. I did.
12    Q  Did you call —
13    A  I — I think I called RMCH or something, ask if
14  everyone was okay. Again, I — you know, I was just
15  shooken up. I just felt real — just I didn't feel too
16  good about it, you know. I don't like to see people get
17  hurt. I don't. I'm not that type of person. It's
18  just — and I — I'm not sure, though. I might have.
19    Q  And who did you talk to when you called?
20    A  I think I asked the nurse or whoever was
21  in. I don't have a name. I just asked who could help me,
22  or "Did you bring some patients in?" and "How they doing?"
23  And I — I don't even think they gave me an answer. I
24  think they were just like, "Well, they just came in," or
25  "they're on their way," or — you know. I think I called

Page 59

1  too early. I don't think they'd even been checked out
2  or — and that was it. I think that's the last contact I
3  even attempted to make with them, pretty much. Yep,
4  that's it.
5    Q  Did you go back out to the scene after you left
6  the second time?
7    A  Um-hmm. I hadn't went back by that scene until
8  I went back out there maybe a week or two ago. I didn't
9  even go out on the highway after that for a while. I
10  didn't — I was just — I didn't drive too much.
11    Q  Why is that?
12    A  Like, you know, I didn't take — I don't know.
13  It just — it bugged me, you know, just to be driving by
14  there. It's just accidents, you know, they shake people
15  up. They — I don't know why I didn't go out there. I
16  hadn't went out there and played games for a while,
17  though, after that. I just didn't want to go to Giant.
18  You know what I mean?
19    Q  Why'd you go out there a week or two ago?
20    A  A week or two after, you mean?
21    Q  No. A week or two ago. You said you went out
22  there --
23    A  No, I meant a week or two after —
24    Q  Oh, okay.
25    A  — not a week or two ago. Like a week or two

Page 60

1  after the accident. What I meant is like I hadn't gone.
2  I didn't want to go out there and drive on the highway. I
3  just didn't want to get on the freeway pretty much.
4    Q  Okay.
5    A  It just bugged me.
6    Q  Did you see, uh — did -- did the car in front
7  of you that was driving along around 70 miles an hour have
8  any blinkers on?
9    A  No.
10    Q  Okay. And you didn't have any blinkers on?
11    A  Yeah, I turned my blinker on.
12    Q  Which blinker?
13    A  My left blinker. I --
14    Q  When did you turn it on?
15    A  — went down like that (indicating). Before I
16  turned, before I was moving. I think — I — I — I think
17  it was on maybe even like 15 seconds. I — I — I turned
18  it on before I even looked in this (indicating) rearview
19  mirror, so it had — it was tick, tick, tick. My blinker
20  was blinking almost the whole time. My blin- --
21    Q  For about 15 seconds?
22    A  My blinker was on when they came up on me, I
23  know that much, that it was still on you, know? It didn't
24  even get to click. So my wheel didn't even go far enough
25  to click off of my blinker. That's what I'm saying. It

Page 61

1  didn't go like a full half turn or whatever it takes to
2  make it, you know, go off by itself. And I just pulled
3  back into this (indicating) lane.
4    Q  After you kept driving on Interstate 40 going
5  west, how far down did you go before you got off of I-40?
6    A  Three miles, I think. Three to four miles. I
7  think that's all it was, because I accelerated heavily
8  after I seen that. I came, I got back on the road —
9  because I was like on the shoulder in the road, and I
10  started going. I wasn't doing the speed limit yet, and I
11  just — I floored it. I went as fast as I could --
12    Q  Okay.
13    A  — to there and — and the — it might have been
14  three or four miles, because it wasn't very far from the
15  State Police. It might have been three or four miles to
16  town from where the wreck was. Maybe five. Maybe. I
17  doubt it, though.
18    Q  Okay. So you went three, four, or five miles --
19    A  Yeah.
20    Q  -- before you got off I-40.
21    A  Um-hmm. About three —
22    Q  Okay.
23    A  — maybe —
24    Q  Okay.
25    A  — because, if it's after Church Rock. I'm not

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM 87110

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 62

1  sure exactly.
2      Q   So where did you get off?
3      A   I got off at the first exit that you could,
4  right there by Denny's. It's right there by Denny's and
5  Chevron. And then you got to take a right and continue
6  going back east to get to the State Police.
7      Q   Okay. Um --
8      A   You want me to --
9      Q   Well, let's -- let's use another piece of paper
10  where you --
11     A   Okay.
12     Q   Draw I-40 where you got off, where you went and
13  how --
14     A   This is I-40.
15     Q   -- you turned around.
16     A   I'm going this way.
17         THE VIDEOGRAPHER: Excuse me, Counsel. This is
18  a five-minute warning to end of tape, where I'll have to
19  change tapes.
20         MR. VIGIL: Okay.
21     A   West. Okay. Here's I-40, and I got off, exit
22  right here (indicating), and then right here is Denny's --
23  it's right there at the edge of town -- and Chevron.
24     Q   The edge of what town?
25     A   Gallup.

Page 63

1      Q   Okay.
2      A   Right here on your way out going east towards
3  Albuquerque. It's the edge, Chevron, whatever.
4      Q   Okay.
5      A   You get off, you come right here (indicating),
6  there's a stoplight intersection. You can either go left
7  into town or you can go right here (indicating). I came
8  this way (indicating), the State Police are right here
9  (indicating). They were probably about quarter mile up
10  from the exit. And after that, I continued this way
11  (indicating) about two, two-and-a-half, three miles to the
12  accident.
13     Q   Okay. So you stayed -- after you went --
14     A   I stayed --
15     Q   -- in and got the State Police --
16     A   -- on 66. I went this way (indicating), because
17  you can't get to the accident on I-40. You know what I'm
18  saying?
19     Q   Okay. Would you put "north" "south" --
20     A   North, south?
21     Q   -- on that as well, and "east."
22     A   East. There you go.
23     Q   Okay. And how fast were you driving --
24     A   On the way --
25     Q   -- on the way to get off on -- when you finally

Page 64

1  got off on the, uh, Gallup-Denny exit?
2         MR. THOMPSON: Let me just interpose an
3  objection here. I don't think that any of this is
4  relevant postaccident.
5         But go ahead and answer the question.
6         THE WITNESS: Okay?
7      A   I don't know exactly how fast I was driving, but
8  I was driving a good speed. I accelerated because I was
9  trying to get there as fast as I could. I didn't look at
10  the -- I couldn't say 85 or 80 or 79. I can't give you an
11  exact --
12     Q   Okay.
13     A   -- but I was going pretty fast.
14     Q   Can you tell me whether you had it floored
15  full-board?
16     A   No, I didn't. Board floored, no. There's --
17  that car, there's no way. I would have hit someone --
18     Q   How fast does that car go?
19     A   It goes pretty fast.
20     Q   What's the fastest --
21     A   120.
22     Q   Okay.
23     A   It'll go 120.
24     Q   Have you driven it faster than 120?
25     A   It won't. It will cut out at 110, I think. I

Page 65

1  think they all have governors on them.
2      Q   Okay.
3      A   I doubt it would go over that. It's not as fast
4  as older Firebirds or -- it's kind of a commercial vehicle
5  too. It's ec- -- economic. It -- it doesn't have the big
6  block and the big -- to send you 200 miles an hour down
7  the road, you know.
8      Q   Okay. And you got off there --
9      A   I got off here (indicating), right there
10  (indicating), hit it, and I went as fast as I could to
11  State Police. Got out of my vehicle, turned it off, I ran
12  in, talked to that lady, told the dispatcher what's going
13  on, and, you know -- you know, kind of hysterical. She's
14  "Okay. Okay. Okay." Took my name. "Okay, chill out."
15  She says, "Okay." To her, it was like, you know, another
16  day. "Okay, I have other things. There's calls,
17  there's --" you can hear the radio. She's like -- like
18  "There -- there's a unit out there on their way. The cops
19  are probably there. The ambulance will be there as fast
20  as possible," you know?
21         And I told her, "Well, I'm going to go back
22  out."
23         She said, "That's up to you. That's your
24  choice." So I didn't even have to go. I just went back.
25     Q   So how long would you say you were at the State

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM 87110

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 66

1 Police office?
2     A   About one minute, one -- one good minute. Just
3 quick talking, just blah-blah-blah-blah-blah-blah.
4     Q   Did you leave your name?
5     A   Yes, I did. I left my name, my number, how they
6 could get ahold of me.
7     Q   Did you write it down or just say --
8     A   Yeah --
9     Q   -- to her --
10    A   -- I wrote it down. She wrote it down. "Waylon
11 Radosevich," here. Whatever. She gave me a little paper.
12 She -- I remember she tore it, and I wrote it down, and my
13 number, and I gave it to her --
14    Q   Okay.
15    A   -- and I told her, "I'm the one reporting it,"
16 whatever.
17        She said, "I think the trucker just reported
18 it," and I hauled out there.
19    Q   All right. And did you go straight back out
20 there or --
21    A   Straight.
22    Q   -- did you stop?
23    A   No, I went straight back out there --
24    Q   Okay.
25    A   -- because there's no other way to go. Right

Page 67

1 here (indicating) there's State Police, then the wreck is
2 like right here (indicating).
3     Q   When you got back out there, all of the people
4 in the van, all the children, the driver, and all the
5 women, had already been taken out?
6     A   Yeah, they were out of the van, but they hadn't
7 been taken away from the scene.
8     Q   They were in ambulances --
9     A   Yeah.
10    Q   -- or on the ground?
11    A   They were still walking around. They -- it
12 wasn't very long. It didn't take me very long to circle
13 around. They were still delirious. They still didn't
14 know what was going on. I almost beat the ambulance back
15 there. You know, there was one ambulance there. I think
16 they came from -- McGaffey, I think, is the closest
17 ambulance they have.
18    Q   Where's McGaffey at?
19    A   McGaffey's about seven to eight miles out of
20 town.
21    Q   Which way out of town?
22    A   East.
23    Q   Okay. Closer to the accident site?
24    A   Yeah -- no, maybe -- maybe halfway, about
25 halfway. They might be halfway to each other, Gallup

Page 68

1 and -- I'm not sure about that.
2     Q   Okay.
3     A   The babies are the only ones I know that were in
4 the paramedic. They were sitting in their car seat.
5 There were three. They were lined up in the back of the
6 paramedic, sitting.
7     Q   In an ambulance?
8     A   Yeah, in an ambulance.
9     Q   Okay.
10    A   Because I went -- I asked for them. I asked.
11 Because I didn't know there was any kids until I got to
12 the accident. Then there's --
13        THE VIDEOGRAPHER: Excuse me.
14        Counsel, I have to change tapes.
15        MR. THOMPSON: All right. Let's just change
16 tapes.
17        THE VIDEOGRAPHER: All right. Let me --
18        MR. THOMPSON: Can we take a break, please?
19        MR. VIGIL: Sure.
20        THE VIDEOGRAPHER: We're going off the record
21 now at approximately 11:10, and it's the end of Tape
22 Number 1 of the video deposition of Waylon Radosevich.
23 And we're going off the record at 11:10.
24        (Recess taken.)
25        (Exhibits 1 and 2 were marked.)

Page 69

1        THE VIDEOGRAPHER: This is the beginning of Tape
2 Number 2 of the video deposition of Waylon Radosevich.
3 The date is June 28th. The time is approximately is 11:19
4 a.m. Videographer is Jim Bess.
5        Just a reminder that you're still sworn in.
6        And you may proceed, Counsel.
7        MR. VIGIL: Thank you.
8     Q   Did you notice anyone else in any of the
9 ambulances?
10    A   No.
11    Q   And did you see --
12    A   I just seen paramedics.
13    Q   -- any women?
14        MR. THOMPSON: Once again, let him finish asking
15 his question.
16    A   I seen some lady standing -- standing there, and
17 they were trying to put some kind of thing up against her
18 back and on her, but she was standing up still. I -- I
19 didn't ask for them as much.
20    Q   Do you remember what that person looked like?
21    A   Yeah. She was slightly tall, kind of wide, and
22 had curly hair, like blonde hair. She --
23    Q   Middle-aged? Older?
24    A   Maybe middle-aged, something like that.
25    Q   Okay. Did you hear an- -- any crying?

18 (Pages 66 to 69)

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 98

1　A　No.
2　Q　-- that clerk incident?
3　A　No. It was because of me.
4　Q　And how long did you see that counselor for the
5　anger management?
6　A　Till I felt I didn't need to see him anymore,
7　and I don't -- I don't --
8　Q　Are we talking --
9　A　-- know how many months.
10　Q　-- months?
11　A　Months.
12　Q　Six months?
13　A　So maybe two, three. I don't know. Whenever I
14　felt like it, to call him and go see him whenever.
15　Q　Did your parents go with you to that sometimes
16　too?
17　A　Yes.
18　Q　At the time of this incident where you were
19　charged by the police with attempting to pass and running
20　the van off the road causing a rollover, why didn't you
21　stop?
22　A　Because I didn't want no one to -- you know, I
23　didn't know if anyone was going to call them in, and I
24　knew the State Police was just right there. I didn't have
25　a phone, so I wanted to go get help. I didn't stop, but I

Page 99

1　was pushed off the shoulder enough to slow down a lot,
2　about 30 miles less than the speed limit, rolling. I
3　looked, and I seen, and I went.
4　　And the reason I didn't stop is 'cause I don't
5　have proper -- how would you say it? -- training to save
6　anyone's life or help them, so, to me, I was no use to
7　those people. If they're hurt, I -- what am I going to
8　do? Stand there and look at them? So that's why I didn't
9　stop. I said I need to get to some help as quick as
10　possible, and I need to get back, and that's what I did.
11　Q　Was there anywhere else --
12　A　No, there wasn't.
13　Q　-- between there and the State Police Office --
14　A　No.
15　Q　-- that you could have stopped to call the
16　police --
17　A　Denny's.
18　Q　-- or an ambulance?
19　A　Denny's, but they're, what -- from Denny's, you
20　can see the State Police, so . . . There was noplace on
21　the freeway, no. There was noplace. That was the closest
22　place to help.
23　Q　Did you think about stopping your car and waving
24　down some traffic to see if anybody had a cell phone?
25　A　No, I didn't. I just figured by the time I do

Page 100

1　that, you never know. You know, what are the chances of
2　that? The quicker I got through, the quicker someone's
3　life will be saved.
4　Q　Did you ever think that it might be important to
5　stop to help any way you could?
6　A　I thought that me helping the best way was
7　getting someone out there that knew where they were doing,
8　that knew how to save lives, that were trained, you know.
9　Q　Um-hmm.
10　A　I don't want to be touching somebody that's hurt
11　and not know. You can move someone the wrong way or --
12　or -- you know. When you get hurt, they're -- they're
13　made to lie down, you know. So, to me, I was a 16-year
14　old kid, I had no training, and the accident happened, and
15　I said, "Hey, it's a car accident." And it didn't seem as
16　bad as I thought it was, you know. It didn't -- I just
17　wanted someone to get out there and help them. It
18　wasn't -- it was an accident. You see accidents every
19　day, you know. Everyone has an accident every day, and
20　who needs to help them but people that are trained. So
21　that's why I went straight to the police office, because
22　there was no phone in between there and, uh -- and the
23　accident.
24　Q　Did you ever consider stopping and waving down a
25　trucker who has a CB radio and --

Page 101

1　A　I didn't think about that.
2　Q　-- access to police.
3　A　No, I didn't. I considered it on my way in
4　town, but by the time you wave someone down, it took -- it
5　didn't take me very long to get in town.
6　Q　How long --
7　A　Town was a minute or two away at that kind of --
8　60 miles an hour, it's only, at the most, three minutes,
9　maybe. So I got there like in two-and-a-half minutes,
10　which is enough time to get there and -- and talk
11　to the State Police. That's -- you know.
12　Q　Did you ever consider that someone could be
13　trapped inside the van and --
14　A　Yes, I did.
15　Q　-- the van could catch fire?
16　A　I considered all of that. Yes, I did. I
17　considered that it was very -- yes, I considered a lot of
18　things.
19　Q　That somebody could be dying and --
20　A　Yes.
21　Q　-- any help at all would be helpful at that
22　moment? Did you consider that?
23　A　Yes, I did.
24　Q　And you decided that you'd keep going anyway?
25　A　I was already going. I didn't consider that

26 (Pages 98 to 101)

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 102

1 someone could be dying or this, 'cause I didn't see no
2 fire. That's the reason I didn't go run. There was no
3 fire. I didn't see no fire from the point of view I was
4 at.
5    Q   Did you consider that someone could be dying
6 even without a fire --
7    A   I considered --
8    Q   -- and needed help immediately?
9    A   -- that any accident someone could be dying. I
10 considered that I almost died. That's what I considered.
11 I considered that I almost hit the guardrail, and maybe I
12 almost got hurt, and that you know, I could have died,
13 too. And I was thanking God all the way that I hope no
14 one's hurt, and I prayed, and I prayed all the way in,
15 "Please, God, don't let no one die."
16    Q   Okay.
17    A   You know, "Don't let no one be hurt," because
18 any accident -- someone runs into you, people have died.
19 I mean, accidents are accidents. Cars are very dangerous
20 vehicles; they have no emotion. I was worried about the
21 people, and I considered that if I took any longer than
22 it's going to take to get someone there, that someone
23 could die. That, you know, I -- all I considered was that
24 I needed to get someone there that could help them in a
25 matter of time; that they only had a little bit of time.

Page 103

1 If someone was hurt, you only have so much time, and the
2 only people that I knew could help them was the ambulance
3 and the doctors. That's -- so that's what I went for.
4 That's the best of my knowledge as a 16-year old kid to
5 help them, you know. I --
6    Q   As -- as a 16-year-old kid, did you feel pretty
7 panicked about what had happened?
8    A   I was shooken up, but I wasn't super panicked.
9 I just didn't want no one to be hurt, you know, like a
10 normal human being, I have feelings, too. I don't want to
11 see no one burned on the side of the road or be hurt, you
12 know. I was -- I was not panicked liked (indicating
13 sound). I didn't -- I didn't overreact, if that's what's
14 you're asking, no. I didn't freak out. I just thought as
15 clear as I could, What do you do? What do you do? You
16 get help. That's the main thing. You -- you get someone
17 out here that can help 'em, and, you know, so . . .
18 That's the best I could do.
19    Q   Did you stop at all to give your name, number,
20 to anybody there that -- to advise that you'd been a part
21 of this incident?
22       MR. THOMPSON: Are you talking about before he
23 went back to the accident --
24       MR. VIGIL: Yes.
25       MR. THOMPSON: -- scene?

Page 104

1    Q   Ye- -- yes. Before you left --
2    A   Just the --
3    Q   -- the scene.
4    A   -- State Police. That's the only people.
5    Q   Okay. Did --
6    A   And I --
7    Q   Did you --
8    A   And I didn't exactly tell them I'd been part of
9 it. I told them I had seen it, that I was a witness to an
10 accident, that I was the car over here in another lane,
11 and I seen this guy come flying off. And that's pretty
12 much . . . So I was a part of it, I guess, if that's how
13 you want to put it.
14    Q   Okay. How wide is your left side-view mirror?
15    A   It's pretty wide. You can see into the other
16 lane --
17    Q   Okay.
18    A   -- to the whole other side, yeah.
19    Q   Gi- -- gi- -- With your hands, give me an
20 approximation.
21    A   It's about like that wide (indicating).
22    Q   How many inches would you say that is?
23    A   It's -- looks about 7 inches, to me.
24    Q   Did you call your parents when you got to the
25 State Police officer -- Office?

Page 105

1    A   No, I didn't call nobody.
2    Q   Okay. Did you have a cell phone with you?
3    A   No, I didn't.
4    Q   Did you have a cell phone?
5    A   I do now; I didn't then.
6    Q   When did you first get a cell phone?
7    A   About a year ago.
8    Q   Did you have any of your parents' cell phones
9 with you --
10    A   No.
11    Q   -- at that time of this incident?
12    A   Nope.
13    Q   Did your parents have cell phones?
14    A   Yeah.
15    Q   Did you ever use them?
16    A   Not hardly. Not -- no.
17    Q   Okay.
18    A   They wouldn't let me use them because they
19 didn't want to pay for my bills for me to be talking, you
20 know. It was their cell phones for business. I had no
21 reason to have a cell phone.
22    Q   Have you or your parents ever been denied
23 insurance coverage based on your driving record?
24    A   I'm not sure. I don't know. I -- I don't pay
25 the insurance. I don't get the insurance.

27 (Pages 102 to 105)

GAUDREAULT, ET AL. VS RADOSEVICH, ET AL.
CV-01-1431 LH/WWD

WAYLON RADOSEVICH
DATE TAKEN: 6/28/2002

Page 106

1   Q   Okay.
2   A   You'd have to ask them that question.
3   Q   Your parents take care of all that?
4   A   Yeah.
5   Q   Have you been in any other car accidents?
6       MR. THOMPSON: Objection.
7   A   No.
8   Q   Did you menson -- mention some drug counseling
9   earlier besides the alcohol counseling?
10  A   No, it was in together, they were together. It
11  was drug/alcohol.
12  Q   Okay.
13  A   I mean, alcohol is a drug, am I correct? Well,
14  it's not a illegal drug, but to them it's a drug. It
15  alters your mind. They want counseling. They wanted me
16  in all counseling, like I said, before I started. He
17  didn't want me to be a drug addict or an alcoholic, and
18  the only way to do that was to show me drug addicts and
19  alcoholics.
20  Q   What other drugs --
21  A   But I never went to a -- NA. No NA, narcotic
22  anonymous, no. I just went to AA with them, and there
23  were some drug abusers in there as well as alcoholics.
24  Q   What other drugs had you been using at the time?
25      MR. THOMPSON: Objection. Irrelevant.

Page 107

1   A   Zero.
2   Q   Okay. What other drugs have you used?
3       MR. THOMPSON: Objection. Irrelevant.
4   A   Pretty much alcohol, and that's it. Maybe
5   cigarettes and -- not -- nothing. I'm not really a drug
6   person. I'm not a -- like a user --
7   Q   Um-hmm?
8   A   -- if that's what you're asking, no.
9   Q   What other drugs had you used prior to this
10  incident?
11  A   None.
12      MR. VIGIL: That's all I have.
13      (Discussion off the record.)
14      MR. VIGIL: Well -- oh, yeah. Just -- we just
15  need to attach the three exhibits that I marked as part of
16  the record. I think that's already done.
17      Why don't you sign those for me, and then just
18  put the dates up next to the exhibits and today's date.
19      THE WITNESS: 28th.
20      MR. THOMPSON: I don't have any questions,
21  but -- but we will read and sign.
22      THE WITNESS: This one, too?
23      MR. VIGIL: No, you don't have to worry about
24  that one.
25      Okay. All right.

Page 108

1       MR. THOMPSON: We'll take another short break?
2       MR. VIGIL: Sure.
3       THE VIDEOGRAPHER: Okay. This --
4       Does this finish this deposition?
5       MR. VIGIL: Yes, it does.
6       THE VIDEOGRAPHER: This concludes this
7   deposition of Waylon Radosevich in Case No. CV-01-141- --
8   31 LH/WWD, at approximately 11:56 a.m., on 6/28 of '02.
9   The master tapes of this deposition will remain on file at
10  Trattel Court Reporting and Videography, 6565 Americas
11  Parkway, Suite 975, Albuquerque, New Mexico 87110.
12      We're going off the record now.
13      (The video deposition concluded at 11:56 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 109

1   Diane Gaudreault, et al., vs. Waylon Radosevich, et al.
2       DEPONENT SIGNATURE/CORRECTION PAGE
3       If there are any typographical errors to your
    deposition, indicate them below.
4
5   PAGE    LINE
6   _____Change to_____
7   _____Change to_____
8   _____Change to_____
9   _____Change to_____
10  Any other changes to your deposition are to be
    listed below with a statement as to the reason
11  for such changes.
12  PAGE  LINE      CORRECTION      REASON FOR CHANGE
13
14
15
16
17
18
19      I, WAYLON RADOSEVICH, do hereby certify that I have
    read the foregoing pages of my testimony as transcribed,
20  and that the same is a true and correct transcript of the
    testimony given by me in this deposition, except for the
21  changes made.
22      _____
            WAYLON RADOSEVICH        DATE
23
24
25

TRATTEL COURT REPORTING & VIDEOGRAPHY
(505)830-0600

6565 AMERICAS PKWY NE, STE 975
Albuquerque, NM 87110

EXHIBIT C

## Page 5

(1) A. Yes.
(2) Q. We're going to talk about that
(3) accident once again. Do you have a recollection
(4) of the accident?
(5) A. Yes, I do.
(6) Q. December 23rd, 1998?
(7) A. Yes.
(8) Q. Do you recall what day of the week
(9) that was?
(10) A. I don't recall the day.
(11) Q. Do you recall about what time the
(12) accident happened?
(13) A. It was around noon. About 10 to 12.
(14) Q. We heard testimony this morning from
(15) your wife generally that you all had spent the
(16) night in Tucumcari; do you agree with that?
(17) A. I agree with that.
(18) Q. Do you agree that you left about 8:00
(19) in the morning?
(20) A. Yes.
(21) Q. How many stops did you make after
(22) Tucumcari? Mrs. DeCamp testified about one
(23) stop.
(24) A. Okay. We stopped -- after we left the
(25) motel, we stopped and got gas and coffee at like

## Page 6

(1) a Kwik Shop or Gas 'N Go.
(2) Q. Okay.
(3) A. Then we went on from there and then we
(4) stopped for Jaiden to go to the bathroom.
(5) Q. That was the stop at the truck stop?
(6) A. That was just a little shop off the
(7) road.
(8) Q. About how long before the accident
(9) occurred?
(10) A. Let's see, probably, I don't know, I'd
(11) guess 30 minutes or so. You mean after we
(12) stopped?
(13) Q. Yeah. That's what I'm getting at.
(14) I'm sorry if that question wasn't clear.
(15) You all were on your way to Phoenix?
(16) A. Yes.
(17) Q. Where do you recall everybody being
(18) place within the vehicle?
(19) A. Well, I was in the driver's seat,
(20) Marlene was sitting in the right of me, Diane was
(21) behind me and Jaiden. The two babies and Lindsey
(22) was in the third seat.
(23) Q. Okay. Was Lindsey in between the two
(24) babies?
(25) A. No, they were sitting together.

## Page 7

(1) Q. Two babies together and Lindsey?
(2) A. Lindsey was on the right side.
(3) Q. Okay. Did you have your cruise
(4) control set prior to the accident?
(5) A. Yes, I did.
(6) Q. What did you have it set at?
(7) A. At the speed limit.
(8) Q. Which was what?
(9) A. 75.
(10) Q. How did you end up in the innermost
(11) lane just prior to the accident?
(12) A. Just prior -- which lane?
(13) Q. The innermost, the passing lane, I
(14) guess you would call it.
(15) A. How did I end up in the passing lane?
(16) Q. Right. We heard testimony earlier
(17) that you were actually driving along in the
(18) innermost lane just prior to this accident
(19) occurring. Where did you actually get over into
(20) that lane; do you recall?
(21) A. When I was following the other cars,
(22) the other car, I just put on my blinker and moved
(23) over in the left lane.
(24) Q. Okay. About how far before the
(25) accident?

## Page 8

(1) A. I'm not sure.
(2) Q. Okay.
(3) A. He wasn't going as fast as me, was
(4) probably going 70 or so, I don't know.
(5) Q. Who's "he"?
(6) A. Well, the car in front of me.
(7) Q. Okay.
(8) A. Anyway I, I -- I was just passing.
(9) Q. Okay. How long were you -- sorry, go
(10) ahead and continue.
(11) A. That's when Marlene hollered at me
(12) when I got up beside him.
(13) Q. What I'm getting at is how long were
(14) you in that lane, the lane that you were in just
(15) prior to the accident before this person came
(16) over in your lane?
(17) A. That, I don't recall.
(18) Q. Okay. Can you tell me if you had just
(19) moved over to pass that car, the car that was
(20) involved in this accident?
(21) A. Yes, I did.
(22) Q. So, you were in the right-hand lane,
(23) and then you moved to the left to actually pass
(24) the silver car that was involved in this
(25) accident?

## Page 9

(1)  A.  Yes.
(2)  Q.  And when you referenced he was going
(3) 70 miles per hour, is this the car that you're
(4) referring to?
(5)  A.  Yes.
(6)  Q.  Was there a vehicle in front of him,
(7) could you tell?
(8)  A.  That, I can't recall.
(9)  Q.  Did you tamper with your cruise
(10) control at all when you were passing? Did you
(11) disengage it, did you accelerate with a button or
(12) anything?
(13)  A.  No.
(14)         MS. LUCERO:  Objection,
(15) compound.
(16)         MR. THOMPSON:  I'm giving him
(17) examples of what I mean by tampering.
(18)  A.  No.
(19)  Q.  No?
(20)  A.  I did not.
(21)  Q.  You let it cruise at the speed that
(22) you had set it at, 75 miles per hour?
(23)  A.  Uh-huh.
(24)  Q.  Okay.  Did you use your turn signal
(25) before you changed lanes?

## Page 10

(1)  A.  I usually do, yes.
(2)  Q.  Do you remember doing it on this
(3) occurrence?
(4)  A.  Yes.
(5)  Q.  How fast were you closing on this
(6) silver car just prior to moving over in the
(7) left-hand lane?
(8)         MS. LUCERO:  Objection, asked and
(9) answered as to speed.
(10)  A.  How fast was I closing? Well, not
(11) that — might have been going a couple miles
(12) faster than he was.
(13)  Q.  You weren't closing very quickly then?
(14)  A.  Not real fast, no.
(15)  Q.  Do you have a specific recollection of
(16) — I asked you about a vehicle in front of the
(17) silver car.  Do you have a specific recollection
(18) of any other automobiles in that general area,
(19) besides you and the silver car?
(20)  A.  I don't remember any, I don't recall
(21) any.
(22)  Q.  How far away were you from the silver
(23) car when you actually made your lane change?
(24)  A.  Say it again.
(25)  Q.  Can you —

## Page 11

(1)  A.  What do you mean?
(2)  Q.  Give me an idea as to the distance
(3) between you and the silver car when you made the
(4) lane change, when you switched over to the
(5) left-hand lane.
(6)  A.  I couldn't recall that.  Not after
(7) this long.
(8)  Q.  Prior to the accident occurring, do
(9) you remember thinking anything about the silver
(10) car, something different about it, weaving,
(11) something like that?
(12)  A.  No, I don't recall that either.
(13)  Q.  I'll give you a piece of paper and ask
(14) you to draw a diagram, if you would.  Let me ask
(15) you a couple of questions before we start.
(16)  A.  I'm not a very good artist.
(17)  Q.  You're not being graded on it.  When
(18) was the first time you noticed the silver car was
(19) coming into your lane?
(20)  A.  Right after Marlene hollered at me.
(21)  Q.  Okay.  Okay.  Did you look over to the
(22) right?
(23)  A.  I glanced over to the right and all I
(24) could see was the right-hand part of his roof,
(25) just a little bit of it through the window.

## Page 12

(1)  Q.  Okay.  Could you tell how close he was
(2) to your van?
(3)  A.  Well, no — well, I couldn't tell you
(4) — I knew he was close because I couldn't see
(5) him, except for the right-hand part of his roof,
(6) just probably about two or three inches of it is
(7) all I could see.
(8)  Q.  At that point when you glanced over,
(9) were you still middle part of your lane, or were
(10) you already moving over to the left at that
(11) point?
(12)  A.  I was in the middle part of the lane
(13) yet.
(14)  Q.  Go ahead and draw the lanes of traffic
(15) there, which would be westbound 40.  Is there a
(16) shoulder on either side of the highway?
(17)  A.  There's a median here in the middle.
(18)  Q.  Write median there.
(19)  A.  Put median?
(20)  Q.  Yes.
(21)  A.  Okay.
(22)  Q.  Is there a shoulder on the other
(23) side? This is the right-hand side of the road?
(24)  A.  Not much of a shoulder.  Just a short
(25) shoulder and it dropped off.

## Page 41

(1) am depressed, no.
(2)   Q. Do you have flashbacks of the
(3) accident?
(4)   A. Yes. Everytime I see a green van. I
(5) liked my green van.
(6)   Q. What color is your new van?
(7)   A. Red.
(8)   Q. How about nightmares?
(9)   A. I can't say that I've had any
(10) nightmares.
(11)   Q. Okay. So then is it true that you
(12) have no medical expenses to this point related to
(13) this accident, you, yourself?
(14)   MS. LUCERO: Object to the form
(15) of the question. You can answer.
(16)   A. No, I haven't.
(17)   Q. When did you return – when did you
(18) resume your business? When did you resume doing
(19) what you do?
(20)   A. Well, let's see, probably would have
(21) been about the 15th of January, somewhere in
(22) there.
(23)   Q. '99?
(24)   A. '99.
(25)   Q. Okay. When was the last date that you

## Page 42

(1) worked – I guess when was your first day of
(2) vacation? You said you were going to go for a
(3) week?
(4)   A. The 21st.
(5)   Q. What income did you lose as a result
(6) of this accident?
(7)   A. Pardon.
(8)   Q. What income did you lose as a result
(9) of this accident?
(10)   A. What income?
(11)   Q. Have you sat down and calculated it?
(12)   A. Well, no, I averaged – I just go by
(13) an average of probably around $4,000 a month
(14) about.
(15)   Q. Is that revenue or is that income?
(16)   A. That's income.
(17)   Q. And so then the income that you would
(18) attribute that you lost due to this accident
(19) then, would it be the difference between the 15
(20) and the 21, minus a week because you were going
(21) to take a week's vacation anyway?
(22)   A. Uh-huh.
(23)   Q. Now, was there – when you did return
(24) back to work, when you started doing your work
(25) again on the 15th, did you have to suspend any

## Page 43

(1) type of work or do anything like that to take
(2) care of your wife besides the initial time
(3) period?
(4)   A. I don't recall if I did or not.
(5)   Q. And for this time period, did you have
(6) to lose – did you lose out on any type of jobs
(7) that you were already contracted to do?
(8)   A. Oh, yes, I would have.
(9)   Q. Do you have record to reflect that?
(10)   A. I don't have any records of it.
(11)   Q. Has this accident affected your
(12) ability to earn an income or earn a higher
(13) income?
(14)   A. No. Hasn't affected.
(15)   Q. We've been going
(16) about an hour, Steve, are you almost done?
(17)   MR. THOMPSON: About 15 minutes
(18) or so.
(19)   MS. LUCERO: Let's take a quick
(20) break.
(21)   (A short recess was taken.)
(22)   Q. Have you been treated for any
(23) psychological difficulties at all not even
(24) relating to this accident but for something else?
(25)   MS. LUCERO: Objection. There's

## Page 44

(1) a physician/patient privilege that he's not put
(2) at issue. I'm going to reserve that, but he can
(3) answer that.
(4)   A. No.
(5)   Q. Good enough. In your complaint
(6) against the defendants you've alleged punitive
(7) damages in this case. When you noticed the
(8) silver car, you say you noticed the right side of
(9) the hood; is that right?
(10)   A. The roof.
(11)   Q. The roof, I'm sorry, you're right, the
(12) roof, could you see it come closer?
(13)   A. I could just barely see about that
(14) much of it when I glanced over.
(15)   Q. Could you tell the car was moving
(16) over, though?
(17)   A. No.
(18)   Q. Do you have any evidence that the
(19) driver of that car tried to hit your van
(20) intentionally?
(21)   A. No.
(22)   Q. Do you have any evidence that the
(23) driver of that other car tried to cause you to
(24) take evasive action, maybe scare you?
(25)   A. No, I don't think so.

## Page 45

(1) Q. Do you have any evidence that the
(2) other driver caused this accident to happen, he
(3) meant for it to happen?
(4)   MS. LUCERO: I object. I think
(5) he's already testified the guy ran him off the
(6) road. What other evidence are you looking for?
(7)   MR. THOMPSON: You have to
(8) establish a mental state, and I want to know if
(9) there's any evidence to that effect.
(10)   A. Say it again.
(11)   Q. Sure. Do you have any evidence that
(12) the driver of the other car meant to cause this
(13) accident?
(14)   A. I don't have any evidence of that.
(15)   Q. Now, getting back to the emotional
(16) distress that you have claimed. Is the distress
(17) more about the accident itself or the
(18) consequences of the accident?
(19)   A. I would say the consequences.
(20)   Q. The additional stress you have been
(21) put under?
(22)   A. Right. With my grandkids in the car
(23) and, you know, paramedics running around, you're
(24) helpless. You cannot, you cannot – there isn't
(25) a whole lot you can do. People are grabbing

## Page 46

(1) babies, cutting them out of the seat belts.
(2) Trying to keep track, you're trying to talk to a
(3) policeman, it's hard.
(4)   Then my wife is, well, we didn't know
(5) yet, but they hauled them all off and I had to
(6) stand around there wondering how they were all
(7) doing. So it was a pretty stressful to – then
(8) we had to spend Christmas there, which wasn't fun
(9) in the hospital. I waited for five hours for the
(10) operation to be done. That's hard. I don't
(11) know, then we had to look at going home without
(12) her, leaving her in Arizona, and then – because
(13) she couldn't travel, no way she could have
(14) traveled with us.
(15)   Q. Sure.
(16)   A. We had to hire a housekeeper to take
(17) care of the house, to keep it clean for when she
(18) did come home and we kept her on a little while
(19) longer.
(20)   Q. Do you have any records for the
(21) housekeeper?
(22)   A. I don't think I do.
(23)   Q. Do you remember what you paid her?
(24)   A. It cost me $50 a day.
(25)   Q. How often did she come?

## Page 47

(1)   A. I think she came once a week or once
(2) every two weeks, I'm not positive.
(3)   Q. I interrupted you, go ahead.
(4)   A. I was done.
(5)   Q. How long did the traumatic effect of
(6) the accident, seeing the accident scene, having
(7) to wonder how your wife is going to be when she
(8) is in surgery, things of that nature, how long
(9) did that affect you? What I am trying to get at,
(10) I'm trying to separate out the stresses of the
(11) accident, having to buy a van, having to take off
(12) for work, and then the actual trauma that you
(13) remember from this accident.
(14)   A. How long did it last?
(15)   Q. Yeah.
(16)   A. Well, it lasted for three or four
(17) months. Because after I got her home, I had to
(18) take – I had to do a lot of extra stuff around
(19) the house, too, that she used to do, because she
(20) wasn't well for quite a while after that.
(21)   Q. Okay. What I'm specifically referring
(22) to is the trauma of the accident, having to see
(23) the babies cut out of the car seats, as you said,
(24) how long did that affect you?
(25)   A. That affect – that will affect you

## Page 48

(1) forever.
(2)   Q. Okay.
(3)   A. That's something that you never want
(4) to see or go through again.
(5)   Q. Did you ever have any physical
(6) manifestations of the stress that you were under?
(7)   A. Physical?
(8)   Q. Right.
(9)   A. Nerves.
(10)   Q. Okay.
(11)   A. You get shaking.
(12)   Q. Right.
(13)   A. I smoked a lot.
(14)   Q. Okay.
(15)   A. Other than that, I don't know. At the
(16) time your adrenaline is flowing pretty heavy.
(17)   Q. How about in the weeks following the
(18) accident?
(19)   A. Well, in the weeks following the
(20) accident, everything was pretty traumatic for
(21) getting her around and everything was a lot
(22) harder to work with.
(23)   Q. Any physical manifestations?
(24)   A. Well, just, no – what do you mean,
(25) physically?